**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BLACKHAWK SCHOOL DISTRICT, a local government entity, | ) ) ) | CIVIL ACTION |
| Plaintiff, | ) ) | No.   2:23-CV-500 |
| v. | ) ) | **Jury Trial Demanded** |
| NORFOLK SOUTHERN CORPORATION and NORFOLK SOUTHERN RAILWAY COMPANY, | ) ) ) ) | |
| Defendants. | ) ) ) | |

**COMPLAINT**
**AND DEMAND FOR TRIAL BY JURY**

Plaintiff, Blackhawk School District, hereby files this Complaint against Norfolk Southern Corporation, and Norfolk Southern Railway Company, and alleges as follows:

**INTRODUCTION**

1.    On February 3, 2023, at approximately 9:00 p.m., eastbound Norfolk Southern Railway freight train 32N derailed in East Palestine, Ohio.

2.    Train 32N was comprised of 2 head-end locomotives, 149 railcars, and 1 distributed power locomotive located between railcars 109 and 110. This included 20 placarded hazardous materials tank cars transporting combustible liquids, flammable liquids, and flammable gas. The derailed equipment included 11 tank cars carrying toxic, hazardous, and dangerous chemicals that subsequently ignited, fueling a large fire that damaged an additional 12 non-derailed railcars.

3.    The fire caused the temperature and pressure to build in several tanker railcars that were carrying the toxic, hazardous, and dangerous chemicals. One or more pressure relief valves then failed, creating a concern that a large explosion would occur, and a full evacuation was ordered for a one-mile by two-mile area surrounding East Palestine, including parts of both Ohio

and Pennsylvania. Norfolk Southern used explosives to breach the tanker railcars, vent/drain the contents onto/into the ground, and then burned the contents on the spot. The toxic fire burned for days. Both the derailment, and the intentional burning of the contents of the railcars, caused toxic, hazardous, and dangerous chemicals to be released onto and into the ground, into the air, and into the surface and subsurface waterways and groundwater.

4.     The toxic fires and the intentionally released plumes of dangerous and toxic chemicals contaminated Plaintiff's lands and buildings, occupied by its students and staff, in Pennsylvania within a 15 mile radius of East Palestine, OH. The release of the toxic, hazardous, and dangerous chemicals was without regard to Blackhawk School District, its students and staff. Instead, the toxic fires and deadly plumes dumped a lethal cocktail on Plaintiff's buildings, property, soil, and water supplies where deposits of the toxic materials have been found.

5.     The release of the toxic, hazardous, and dangerous chemicals onto and into the ground, into the air, and into the surface and subsurface waterways and groundwater was caused by the negligent, reckless, ultrahazardous, and/or intentional conduct of the Defendants, independently or jointly, by and/or through their agents and employees, for which Defendants are vicariously liable. As a direct and proximate result, the Plaintiff has suffered, and will suffer, a multitude of substantial injuries, including, but not limited to, becoming a first responder, having its students and staff being forced to evacuate their homes for a substantial period of time; having its students and staff suffer medical problems including rashes, eye irritation, and respiratory problems; loss of the use and enjoyment of its property; contamination of its property, soil, and water; the need for substantial future monitoring of its property, soil, and water; increased risk of future disease for its students and staff; and the need for substantial future medical monitoring.

**PARTIES**

6.     Plaintiff, Blackhawk School District, is a school district that, as of at least February 3, 2023, and continuing thereafter, owns and possesses school buildings and facilities located at 500 Blackhawk Road, Beaver Falls, PA 15010; 402 Shenango Road, Beaver Falls, PA 15010; 635 Shenango Road, Beaver Falls, PA 15010; and 701 Darlington Road, Beaver Falls, PA 15010. These facilities are all within a 15 mile radius of East Palestine, OH.

7.     Blackhawk School District encompasses a 69 square mile area, and includes students from both Beaver and Lawrence Counties in Pennsylvania.

8.     Defendant, Norfolk Southern Corporation ("NSC"), is a corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia, with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

9.     Defendant, Norfolk Southern Railway Company ("NSRC"), is a wholly owned subsidiary of NSC. NSRC is a Class I railroad corporation duly organized and existing under and by virtue of the laws of the Commonwealth of Virginia, with its principal place of business located at 1200 Peachtree Street, NE, Atlanta, Georgia 30308.

10.    NSRC operates approximately 19,300 route miles in 22 states and the District of Columbia, including more than 2,000 route miles in Pennsylvania and serves every major container port in the eastern United States.

11.    NSC controls NSRC, and/or NSC has established management, financial, operational safety standards, and parameters for NSC's operations which directly involve the subject train, railway, and safety devices.

12.    At all relevant times, NSC and/or NSRC, independently, or jointly, owned the freight train that derailed in East Palestine, Ohio, on February 3, 2023.

13. At all relevant times, NSC and/or NSRC, independently or jointly, by and through its/their agents and employees, operated and controlled the freight train that derailed in East Palestine, Ohio, on February 3, 2023.

14. At all relevant times, NSC and/or NSRC, independently or jointly, by and through its agents and employees, were responsible for the safe operation, maintenance, and repair of the freight train that derailed in East Palestine, Ohio, on February 3, 2023.

15. At all relevant times, NSC and/or NSRC, independently or jointly, owned or leased the railway that the freight train derailed from in East Palestine, Ohio, on February 3, 2023.

16. At all relevant times, NSC and/or NSRC, independently or jointly, by and through its agents and employees, were responsible for the safe operation and maintenance of the railway that the freight train derailed from in East Palestine, Ohio, on February 3, 2023.

17. At all relevant times, NSC and/or NSRC, independently or jointly, by and through its agents and employees, were responsible to ensure that safe hazardous material response measures were undertaken, including but not limited to the safe containment and mitigation of hazardous material spills from trains owned and operated by NSC and/or NSRC, or by trains owned and operated by others on the railway owned and operated by NSC and/or NSRC.

## JURISDICTION AND VENUE

18. The matter in controversy here exceeds the sum of $75,000. Plaintiff is a Pennsylvania local governmental entity. Defendants are citizens of the State of Georgia where they are headquartered, and the Commonwealth of Virginia where they are incorporated. Thus, subject matter jurisdiction exists pursuant to 28 USC §1332(a)(1).

19. Venue is proper in this judicial district pursuant to 28 USC §1391(b)(2), as Defendants tortious and otherwise improper conduct caused a nuisance, trespass, and damages to occur within

4

the Western District of Pennsylvania, and the properties that are the subject of the action are situated within the Western District of Pennsylvania.

## FACTS

20.     On February 3, 2023, at approximately 9:00 p.m., a freight train owned and operated by the Defendants derailed in East Palestine, Ohio, as set forth above.

21.     Plaintiff's buildings and property are all located within a 15 mile radius of East Palestine, Ohio.

22.   On February 14, 2023, the National Transportation Safety Board ("NTSB") issued a preliminary Investigative Update regarding the February 3, 2023 train derailment (**Exhibit 1**), stating that: "On Feb. 3, at approximately 8:54 p.m., local time, eastbound Norfolk Southern Railway, general merchandise freight train 32N, derailed on main track 1 in East Palestine, Ohio. As a result of the derailment, 38 railcars derailed and a fire ensued which damaged an additional 12 railcars. There were 20 total hazardous material railcars in the train consist – 11 of which derailed."

23.   The NTSB's February 14, 2023, preliminary Investigative Update also stated that "NTSB investigators have identified and examined the rail car that initiated the derailment. Surveillance video from a residence showed what appears to be a wheel bearing in the final stage of overheat failure moments before the derailment. The wheelset for the suspected railcar has been collected as evidence for metallurgical examination. The suspected overheated wheel bearing has been collected and will be examined by engineers from the NTSB Materials Laboratory in Washington D.C."

24.     Several other security videos taken in or around Salem, Ohio, approximately 20 miles prior to the derailment cite, shows sparks and flames coming from the axil of the freight train. At

least one such video was taken at a location prior to the location of a safety detection device (sometimes referred to as a "hot box detector"[1]), which scans the temperature of axles as a train passes and sounds an alert if a bearing/axle is overheated.

25. Prior to the derailment, the train crew received an alert about a mechanical issue with an axle on one of the rail cars. The NTSB has confirmed this was the cause of the derailment.[2]

26. Eleven of the railway cars that derailed contained toxic, hazardous, and/or otherwise harmful chemicals and materials, including vinyl chloride, dipropylene glycol, diethylene glycol, ethylene glycol monbutyl ether, polyvinyl, polypropyl glycol, isobutylene, butyl acrylates, petro oil, and benzene.

27. The amounts released included 688,000 pounds of polyvinyl, 273,394 pounds of Ethylhexyl Acrylate, 273,394 pounds of Ethylene Glycol Monobutyl Ether, 206,000 pounds of Butyl Acrylates, and 1,109,400 pounds of Vinyl Chloride

28. These chemicals and materials leaked from the railcars onto the ground, into the air, and into nearby waterways.

29. The emergency response was extensive, including local emergency services, state and federal agencies, and the Ohio National Guard.

30. One or more safety pressure relief valves owned, operated, and/or maintained by Defendants also malfunctioned. As the temperature of the fire and railcars containing vinyl chloride increased, the pressure increased in one or more of these railcars as well.

---

[1] A "hot box" is a term used to describe an overheated axle bearing.
[2] https://www.wfmj.com/story/48313339/ntsb-confirms-rail-car-axle-issue-caused-norfolk-southern-train-derailment.

31.   The pressure in one or more of the railcars containing vinyl chloride could not be released due to one or more malfunctioning safety pressure relief valves that were owned, operated, and/or maintained by Defendants.

32.   Fearing a massive explosion, governmental authorities ordered an evacuation in a one-mile by two-mile area surrounding East Palestine, including parts of both Ohio and Pennsylvania.

33.   To prevent the feared explosion, Defendants proposed and then conducted, by and through its agents and/or employees, a so called "controlled" explosion of five (5) tanker cars in order to breach these railcars and vent/drain the chemicals onto/into the ground, in a nearby ditch.

34.   Defendants proposed and then proceeded, by and through its agents and/or employees, to turn the ground and ditch area where the chemicals had been vented/drained into a make-shift toxic burn pit.

35.   Defendants proposed and then proceeded, by and through its agents and/or employees, to burn the toxic, hazardous, and dangerous chemicals and materials, including five (5) tanker cars that contained more than 1,000,000 pounds of vinyl chloride, which further caused toxic, hazardous, dangerous chemicals and materials to be released onto/into the ground, into the surface and subsurface waters, and into the air in East Palestine and surrounding areas.

36.   Vinyl chloride is extremely toxic and hazardous and can cause mutation of DNA, and exposure is associated with increased risk of cancers, including liver cancer.

37.   When the vinyl chloride was released and burned, it released other toxic, hazardous, and dangerous chemicals, including but not limited to dioxins, phosgene, hydrogen chloride (hydrochloric acid), benzene and unsaturated hydrocarbons into the air. Phosgene is a highly toxic gas and was used as a chemical weapon in World War 1. Hydrogen chloride is a harmful chemical, causing skin, eye, nose, and throat irritation upon exposure.

38.   These chemicals and materials that were released from both the initial derailment and the subsequent toxic burn pit have seeped into the air, surface and sub-surface soil, surface and sub-surface waters, streambeds, riverbeds, and groundwaters, and spread through the air and waterways for hundreds, if not thousands, of miles, including into the Ohio River. These chemicals and materials were all dumped onto Plaintiff's buildings, soil, land, and water supply.

39.   The United States Environmental Protection Agency ("EPA") sent a letter to Defendant Norfolk Southern Railway Company dated February 10, 2023 (**Exhibit 2**) regarding the subject derailment, stating in part that:

(a)   The EPA "has documented the release or threat of release of hazardous substances, pollutants or contaminants into the environment from the East Palestine Train Derailment Site;"

(b)   Regarding the subject train, "[a]pproximately 20 rail cars were listed as carrying hazardous materials;"

(c)   "Cars containing vinyl chloride, butyl acrylate, ethylhexyl acrylate, and ethylene glycol monobutyl ether are known to have been and continue to be released to the air, surface soils, and surface waters;"

(d)   "Based on information presently available to EPA, EPA has determined that Norfolk Southern Railway Company … may be responsible under CERCLA for cleanup of the Site or costs EPA has incurred in cleaning up the Site;"

(e)   "Based on the information collected during and following the incident that occurred on February 3, 2023, at approximately 8:55 PM EST in East Palestine, Ohio, EPA believes that Norfolk Southern may be liable under Section 107(a) of CERCLA

with respect to the East Palestine Train Derailment Site, as a current or previous owner and/or operator of the Site;"

(f) The EPA has "Made the following observations:

    i. Materials released during the incident were observed and detected in samples from Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, Little Beaver Creek, and the Ohio River.

    ii. Materials related to the incident were observed entering storm drains.

    iii. Multiple rail cars and tankers were observed derailed, breached, and/or on fire, that included but not limited to the following materials:

        1. Vinyl chloride;
        2. Ethylene glycol monobutyl ether;
        3. Ethylhexyl acrylate;
        4. Isobutylene;
        5. Butyl acrylate;

    iv. Five rail car tankers of vinyl chloride were intentionally breached; the vinyl chloride was diverted to an excavated trench and then burned off;

    v. Areas of contaminated soil and free liquids were observed and potentially covered and/or filled during reconstruction of the rail line including portions of the trench that was used for the open burn off of vinyl chloride.

40. Pennsylvania Governor Josh Shapiro sent Alan Shaw, President and CEO of Norfolk Southern Corporation, a letter dated February 14, 2023 (**Exhibit 3**), stating in part that:

(a) "Norfolk Southern failed to implement Unified Command, creating confusing and resulting in a general lack of awareness for first responders and emergency management of the tactics Norfolk Southern planned in response;"

(b) "Norfolk Southern gave inaccurate information and conflicting modeling about the impact of the controlled release that made protective action decision making more difficult in the immediate aftermath of the derailment; and,

(c) "Norfolk Southern's unwillingness to explore or articulate alternate courses of action to their proposed vent and burn limited state and local leaders' ability to respond effectively;"

41. On February 21, 2023, the EPA issued its Unilateral Administrative Order for Removal Actions (**Exhibit 4,** without appendices), containing the following findings of fact, in pertinent part:

(a) The East Palestine Train Derailment Site is located within a mixed-use residential, commercial, and industrial area, with residential properties northwest, southeast, and south of the derailment area. Residential properties are also located along contaminated waterways which became contaminated after the derailment and are within the affected area. The Ohio-Pennsylvania border is located less than a mile from the derailment location. The nearest public well supply is located approximately one (1) mile from the derailment location. A ditch, located on the south side of the tracks flows west for approximately 1,000 feet before it empties into Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek before emptying into the Ohio River. Wetlands and State Line Lake are located immediately adjacent to the Northeast of the Site…

(b) A train derailment occurred at approximately 2055 eastern standard time (EST) on February 3, 2023, in East Palestine, Columbiana County, Ohio, less than a mile from the Ohio-Pennsylvania border. Norfolk Southern Railway Company reported the incident at 2253 EST to the National Response Center (NRC). Federal, state, and local officials arrived on scene after the derailment. EPA mobilized to the Site with EPA Superfund Technical Assessment and Response Team (START) at approximately 2330 EST on February 3, 2023…

(c) At the time of the initial report, the number of derailed rail cars (of the 149) was unknown but 20 of the rail cars were listed by Norfolk Southern Railway Company as carrying hazardous materials, described as: Vinyl Chloride, Stabilized (5); Sulfuric Acid (5); Ethylene Glycol Monobutyl Ether (1); Butyl Acrylate, Stabilized (2); Combustible Liquids nos (1); Isobutylene (1) Ethyl-Hexyl Acrylate(1); Empty Residue – last contained liquified petroleum gas (LPG) (1); Residue – last contained Benzene (2).

(d) The derailment resulted in a large fire affecting numerous rail cars, including rail cars carrying hazardous materials, although the status (e.g. breached, burning, etc.) was initially unknown due to safety concerns associated with the fire as well as the position of the derailed cars, which affected the ability of responders to identify which rail cars were actively breached and/or burning. Initially, a shelter-in-place order was recommended, and firefighting efforts were stood down due to safety concerns; however, an evacuation order was enacted by the Village of East Palestine on February 4, 2023. The fire continued to burn throughout the following days. Local citizens reported smoke from the fire observed over the State of Ohio and the Commonwealth of Pennsylvania.

(e) Southern Railway Company provided response officials at the Site, including EPA, with a list of the contents of the rail cars which derailed at the Site…On February 3, 2023, at 2201 EST, Norfolk Southern Railway Company provided response officials at the Site with a consist (manifest) which details the volume of materials in each rail car. … Rail cars 23 through 74 were the rail cars which derailed, eleven of which contained hazardous materials…

(f) Releases of hazardous substances occurred after the derailment and subsequent fires Releases to the air occurred when hazardous substances spilled from the rail cars, when smoke from burning rail cars was produced, and hazardous substances including vinyl chloride, phosgene and hydrogen chloride were released. Releases to surface water occurred when liquid product exited rail cars and also when run-off from firefighting efforts at the derailment location moved through a ditch to Sulphur Run, which joins Leslie Run, to Bull Creek, to North Fork Little Beaver Creek, to Little Beaver Creek, and then the Ohio River. Releases to soil occurred (1) when liquid product exited rail cars after the derailment (2) when run-off from firefighting efforts at the derailment location flowed from the right-of-way to adjoining property, and (3) when ash from the burns landed on soil. Local citizens reported smoke from the burns observed over the State of Ohio and the Commonwealth of Pennsylvania.

(g) The following are health/environmental effects associated with the hazardous materials involved in the derailment, or were detected in air, water, soil, and sediment samples, or were combustion by-products of some of those chemicals at the Site:

> i.  <u>Vinyl Chloride</u>: Breathing high levels of vinyl chloride can cause dizziness or sleepiness. Breathing very high levels can cause fainting and breathing even higher levels can cause death. Studies have shown chronic inhalation of vinyl chloride for several years causes changes in the structure of the liver, and individuals who breath high levels are more likely to experience these changes. Highly exposed workers have also developed liver cancer (angiosarcoma of the liver). The effects of ingesting high levels of vinyl chloride are unknown. Dermal exposure may cause numbness, redness, and blisters. Animal studies have shown that exposure to vinyl chloride during pregnancy can affect the growth and development of the fetus. Vinyl chloride is a known human carcinogen according to the Department of Health and Human Services

(DHHS), the International Agency for Research or Cancer (IARC), and the EPA.

ii. <u>Ethylene Glycol Monobutyl Ether</u>: Routes of exposure include ingestion and dermal contact. Inhaling Ethylene glycol monobutyl ether can irritate the nose and throat. It can also cause nausea, vomiting, diarrhea, and abdominal pain. Exposure can cause headache, dizziness, lightheadedness, and passing out. It may damage the liver and kidneys.

iii. <u>Isobutylene</u>: Acute exposure to isobutylene is associated with the following health effects: irritation of eyes, nose, and throat; dermal contact can cause frostbite; headache, dizziness, lightheadedness, and fatigue. Higher levels of isobutylene can cause coma and death. Chronic health hazards include cancer hazard, reproductive hazard, and other long-term health effects.

iv. <u>Benzene</u>: Breathing very high levels of benzene can result in death, while high levels can cause drowsiness, dizziness, rapid heart rate, headaches, tremors, confusion, and unconsciousness. Exposure through ingestion can cause vomiting, irritation of the stomach, dizziness, sleepiness, convulsions, rapid heart rate, and death. The major effect of benzene from chronic exposure is on the blood. Benzene causes harmful effects on the bone marrow and can cause a decrease in red blood cells leading to anemia. It can also cause excessive bleeding and can affect the immune system, increasing the chance of infection. benzene may affect menstruation and decrease the size of ovaries in women following many months of exposure to high levels. Benzene is a known human carcinogen according to the Department of Health and Human Services, the International Agency for Research or Cancer (IARC), and the EPA.

v. <u>Butyl Acrylate</u>: Butyl acrylate can cause health effects due to inhalation and through dermal contact. Contact with butyl acrylate can irritate the nose, throat, and lungs. Butyl acrylate may cause a skin allergy. Exposure to butyl acrylate can cause headache, dizziness, nausea, and vomiting. Repeated exposure can lead to permanent lung damage.

vi. <u>Phosgene</u>: Exposure to phosgene in the air can cause eye and throat irritation. High amounts in the air can cause severe lung damage. Exposure can occur through inhalation, dermal contact, or (less likely) ingestion. Higher levels of phosgene can cause lungs to swell, making it difficult to breathe. Even higher levels can result in severe lung damage that might lead to death. Dermal contact with phosgene can result in chemical burns or may cause frostbite.

vii. <u>Hydrogen Chloride</u>: Hydrogen chloride is irritating and corrosive to any tissue it contacts. Brief exposure to low levels causes throat irritation. Exposure to higher levels can result in rapid breathing, narrowing of the

bronchioles, blue coloring of the skin, accumulation of fluid in the lungs, and even death. Exposure to even higher levels can cause swelling and spasm of the throat and suffocation. Some people may develop an inflammatory reaction to hydrogen chloride. This condition is called reactive airways dysfunction syndrome (RADS), a type of asthma caused by some irritating or corrosive substances. Depending on the concentration, hydrogen chloride can produce conditions from mild irritation to severe burns of the eyes and skin. Long-term exposure to low levels can cause respiratory problems, eye and skin irritation, and discoloration of the teeth. Swallowing concentrated hydrochloric acid will cause severe corrosive injury to the lips, mouth, throat, esophagus, and stomach.

(h) Acrylate odors were noted by responders during indoor air monitoring.

(i) Acrylate odors along Sulphur Run, Leslie Run, Bull Creek, North Fork Little Beaver Creek, and Little Beaver Creek were noted by responders during sampling and containment activities.

(j) ODNR reported an estimated number of aquatic animals killed at approximately 3,500. Those aquatic animals were found in Sulphur Run, Leslie Run, Bull Creek, and a portion of the North Fork of Beaver Creek. Most of the fish appear to be small suckers, minnows, darters, and sculpin. Most of these deaths are believed to have been caused by the immediate release of contaminants into the water.

42. All of the materials listed above have been deposited on Plaintiff's property, contaminating its soil and water supply due to the close proximity of its buildings located within a 15 mile radius.

43. Norfolk Southern has had numerous derailments in the past several years, including derailments resulting in multiple deaths and injuries, extensive property damage, and releases of hazardous materials and substances, many of which were caused by faulty wheel bearings. These accidents put Norfolk Southern on notice that its operations and safety practices and procedures were deficient and would result in further accidents and resulting injuries and damage.

14

# COUNT ONE
## Negligence

44.  Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

45.  Each Defendant had a duty to operate their railway, including the subject freight train, in a non-negligent manner, and owed the Plaintiff a duty of care.

46.  The derailment of the subject freight train was directly and proximately caused by the Defendants' breach of their duty of care by negligent and/or reckless acts and omissions.

47.  The Defendants breached their duty of care because they:

(a)  Failed to safely operate, maintain, inspect, and/or repair the subject railway, railway safety devices, and subject railway cars;

(b)  Failed to safely route the train so that hazardous materials were not routed through populated areas;

(c)  Failed to safely transport hazardous, toxic, and dangerous substances;

(d)  Failed to ensure that there were an adequate number and type of functioning wayside defect detectors or other functioning railway safety detection devices to timely alert the Defendants and their employees of a malfunctioning bearing, axle, railway car or railway;

(e)  Failed to adequately train their employees and agents in the safe operation, maintenance, inspection, and repair of the subject railway, railway safety devices, and subject railway cars and in the transportation of hazardous, toxic, and dangerous substances;

(f)  Failed to provide an adequate number of employees and agents to operate and monitor the train and railway;

(g)  Violated federal and state laws and regulations and internal policies and procedures regarding the operation and safety of the train and railway;

(h)  Failed to have a proper emergency response plan to contain the spread of toxic, hazardous, and dangerous chemicals and materials into/onto the ground, into the air, and into the surface and subsurface waters in the event of derailment or other emergency, and/or failed to timely and properly implement such plan;

(i) Failed to properly contain the spread of toxic, hazardous, and dangerous chemicals that resulted from the derailed train cars and failed to properly dispose of same;

(j) Failed to timely, effectively, and safely contain and clean up the derailment site and the released toxic, hazardous, and dangerous chemicals;

(k) Failed to accurately assess and/or failed to communicate the risk of exposure to the chemicals released from the railcars and the chemicals released from burning same;

(l) At the time of the derailment, the subject train was under the exclusive management and control of the Defendants, the derailment was caused by a problem with an axle on a railcar, and the derailment would not have occurred in the ordinary course of events if ordinary care had been used (i.e., if the Defendants had properly inspected and maintained, repaired, or replaced the faulty axle). Thus, pursuant to *res ipsa loquitur*, a breach of duty by the Defendants, and that the breach was the proximate cause of the injuries, and negligence by the Defendants can be inferred; and,

(m) Otherwise engaged in negligent acts.

48.   As a direct and proximate result of Defendants' breach of their duty of care, the Plaintiff has been harmed, including but not limited to medical and health issues for its students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, increased risk of disease, and expenses of future medical monitoring.

49.   Defendants' conduct averred herein constitutes recklessness, willful and wanton conduct, and/or actual malice, and shows a conscious disregard of the rights and safety of other

persons (including the Plaintiff) that has a great probability of causing substantial harm. Punitive damages are warranted.

## COUNT TWO
### Negligence Per Se

50.  Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

51.  Plaintiff believes and avers that the Defendants violated the following regulations:

    (a) 49 CFR §215.105, forbidding a railroad from placing or continuing to place a railroad car in service if it has an axle that is broken, cracked, has gouges, a cracked or broken end collar, or the surface of a plain bearing journal on the axle has certain listed defects;

    (b) 215.13, requiring pre-departure inspection of freight cars;

    (c) 215.15, requiring periodic inspection of freight cars; and,

    (d) Otherwise engaging in statutory violations.

52.  The purpose of these statutes and regulations was the protection of individuals and businesses, which include the Plaintiff, from harm.

53.  The violation of these statutes caused harm to the Plaintiff, which was the type of harm these regulations were designed to prevent.

54.  The Defendants were negligent *per se*.

55.  As a direct and proximate result of Defendants' breach of their duty of care, the Plaintiff has been harmed, including but not limited to medical and health issues for its students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real

property, loss of use and enjoyment of property, increased risk of disease, and expenses of future medical monitoring.

56.   Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Plaintiff) that has a great probability of causing substantial harm.  Punitive damages are warranted.

<u>**COUNT THREE**</u>
<u>**Strict Liability**</u>
**(Plead in the Alternative to Negligence)**

57.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

58.   The Defendants engaged in abnormally dangerous and ultrahazardous activity, and Defendants are strictly liable for harm resulting from such activity.

59.   Restatement (Second) of Torts §519: "One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm."

60.   Restatement (Second) of Torts §520: "In determining whether an activity is abnormally dangerous, the following factors are to be considered:

     (a) Existence of a high degree of risk of some harm to the person, land or chattels of others;
     (b) Likelihood that the harm that results from it will be great;
     (c) Inability to eliminate the risk by the exercise of reasonable care;
     (d) Extent to which the activity is not a matter of common usage;
     (e) Inappropriateness of the activity to the place where it is carried on; and,
     (f) Extent to which its value to the community is outweighed by its dangerous attributes."

61.   The transportation of the hazardous, toxic, and dangerous chemicals and materials by train (or in the alternative the transportation of vinyl chloride by train) was an ultrahazardous and abnormally dangerous activity for reasons including but are not limited to the following:

(a) Such transportation creates a high degree of risk of some harm to the person, land or chattels of others.  Derailments are very common, as can be seen by the numerous freight train derailments in the United States per year (1,242 in 2019, 1,013 in 2020, 1,002 in 2021, and 1,044 in 2002[3]);

(b) The likelihood that harm will result from this activity is great.  These trains travel past private land and through many densely populated areas, thus any derailment and subsequent release of chemicals will harm surrounding properties and populations;

(c) Even with the exercise of reasonable care, such derailments would still have happened;

(d) The transportation of hazardous chemicals is strictly regulated by the government, and is not an activity that is commonly engaged in;

(e) As can be seen by the accident in East Palestine, hazardous chemicals are routinely transported through populated areas, which is inappropriate, as these common derailments can result in the forced evacuations of thousands of people; and,

(f) The value to the community of transportation of hazardous chemicals, especially through populated areas, is outweighed by its dangerous attributes.

62.   Employees or agents of the Defendants carried out a so called "controlled" explosion of the five tanker cars that were at risk of explosion in order to breach the tanker railcars and vent/drain the contents onto/into the ground. The hazardous, toxic, and dangerous chemicals and materials were then set on fire. This was an ultrahazardous and abnormal activity, because:

(a) Breaching the tanker railcars and venting/draining the contents onto/into the ground and then burning the toxic of toxic, hazardous, and dangerous chemicals – which releases other toxic, hazardous, and dangerous chemicals and materials as a byproduct (including but not limited to phosgene and hydrogen chloride), creates a high degree of risk of some harm to the person, land or chattels of others;

(b) It is likely that harm will result from breaching the tanker railcars, venting/draining the contents onto/into the ground, and then burning the toxic, hazardous, and dangerous chemicals;

---

[3] https://safetydata.fra.dot.gov/officeofsafety/publicsite/summary.aspx

(c) Even with the exercise of reasonable care, harm would result from breaching the tanker railcars, venting/draining the contents onto/into the ground, and then burning the toxic, hazardous, and dangerous chemicals;

(d) This is not an activity that is commonly engaged in;

(e) Having this toxic burn pit in a populated area was inappropriate. There is no safe way to conduct such activity. It caused the mandatory evacuation of the entire town of East Palestine and some surrounding areas for five days. Others voluntarily evacuated; and,

(f) The value to the community of from breaching the tanker railcars, venting/draining the contents onto/into the ground, and then burning the toxic, hazardous, and dangerous chemicals is outweighed by its dangerous attributes.

63.   Defendants are strictly liable for the harm suffered by the Plaintiff resulting from the operation of the subject train, the derailment, and subsequent response.

64.   As a result of the Defendants' actions and omissions as set forth herein, Plaintiff has been harmed, including but not limited to medical and health issues for its students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, increased risk of disease, and expenses of future medical monitoring.

65.   Defendant's conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including Plaintiff) that has a great probability of causing substantial harm.  Punitive damages are warranted.

## COUNT FOUR
## Private Nuisance

66.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

67. Pursuant to the Restatement (Second) of Torts, §821D, "A private nuisance is a nontrespassory invasion of another's interest in the private use and enjoyment of land."

68. Pursuant to the Restatement (Second) of Torts, §822:

> One is subject to liability for a private nuisance if, but only if, his conduct is a legal cause of an invasion of another's interest in the private use and enjoyment of land, and the invasion is either:
>
> (a)  Intentional and unreasonable, or
>
> (b)  Unintentional and otherwise actionable under the rules controlling liability for negligent or reckless conduct, or for abnormally dangerous conditions or activities.

69. The derailment and resulting release of toxic, hazardous, and dangerous chemicals and materials resulted in a private nuisance – an invasion of the Plaintiff's interest in the private use and enjoyment of land.

70. This invasion was the direct and proximate result of the Defendants' (1) negligent conduct, or (2), intentional, reckless conduct, and/or abnormally dangerous activities and/or conditions.

71. As a result of this private nuisance, the Plaintiff has been harmed, including but not limited to medical and health issues for its students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, increased risk of disease, and expenses of future medical monitoring.

72. Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including Plaintiff) that has a great probability of causing substantial harm.  Punitive damages are warranted.

## COUNT FIVE
## Public Nuisance

73.  Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

74.  Pursuant to Restatement (Second) of Torts, §821B:

    (1) A public nuisance is an unreasonable interference with a right common to the general public.

    (2) Circumstances that may sustain a holding that an interference with a public right is unreasonable include the following:

        (a) Whether the conduct involves a significant interference with the public health, the public safety, the public peace, the public comfort or the public convenience; or,

        (b) whether the conduct is proscribed by a statute, ordinance or administrative regulation; or,

        (c) whether the conduct is of a continuing nature or has produced a permanent or long-lasting effect, and, as the actor knows or has reason to know, has a significant effect upon the public right.

75. Pursuant to Restatement (Second) of Torts, §821C:

    (1) In order to recover damages in an individual action for a public nuisance, one must have suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public that was the subject of interference.

    (2) In order to maintain a proceeding to enjoin to abate a public nuisance, one must:

        (a) have the right to recover damages, as indicated in Subsection (1); or,

        (b) have authority as a public official or public agency to represent the state or a political subdivision in the matter; or,

        (c) have standing to sue as a representative of the general public, as a citizen in a citizen's action.

76.  The derailment and subsequent release of toxic, hazardous, and dangerous chemicals and materials resulted in a public nuisance.

77. The release and spread of these chemicals and materials was an unreasonable and significant interference with rights common to the general public, including public health, public safety, public peace, public comfort, public convenience, and the right to clean public water and fresh air in public spaces.

78. The release and spread of these chemicals and materials has produced a permanent and long-lasting effect.

79. This public nuisance also interfered with the Plaintiff's rights to use and enjoy its property.

80. This was a significant harm, involving more than slight inconvenience.

81. This harm was of greater magnitude and of a different kind that that which the general public suffered.

82. This invasion was the direct and proximate result of the Defendants' (1) negligent conduct, or (2), intentional, reckless conduct, and/or abnormally dangerous activities and/or conditions.

83. As a result of this public nuisance, the Plaintiff has been harmed, including but not limited to medical and health issues for its students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, increased risk of disease, and expenses of future medical monitoring.

84.   Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including the Plaintiff) that has a great probability of causing substantial harm.  Punitive damages are warranted.

<strong><u>COUNT SIX</u></strong><br><strong><u>Future Health Monitoring</u></strong>

85.   Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

86.   The subject derailment and "controlled" explosion and burn, which are a result of Defendant's negligence as set forth in this Complaint, resulted in the release of proven hazardous substances into the surrounding air, surface soil, surface water, and groundwater.

87.   These substances include but are not limited to vinyl chloride, phosgene, hydrogen chloride, dipropylene glycol, diethylene glycol, ethylene glycol monbutyl ether, polyvinyl, polypropyl glycol, isobutylene, butyl acrylates, petro oil, and benzene.

88.   As a result, the Plaintiff's students were exposed to greater-than-normal background levels of these chemicals and materials.

89.   As a proximate result of these exposures, the Plaintiff's students have a significantly increased risk of contracting one or more serious latent diseases and/or respiratory diseases.

90.   Monitoring procedures exist that make the early detection of these serious latent diseases possible.

91.   These monitoring regimes are different than those normally recommended in the absence of such exposures.

92.   These monitoring regimes are reasonably necessary to protect the Plaintiff's students according to contemporary scientific principles.

93.     Plaintiffs request that the Court establish a medical monitoring program, managed by court-appointed and court-supervised trustees, whereby Plaintiffs students will be monitored by physicians, and the medical data produced utilized for epidemiological or other scientific studies.

94.     Establishing a Court-supervised medical monitoring program will ensure that funds are reserved, available, and used for medical monitoring, scientific studies, and related activities, the details of which are to be determined by the Court after being advised by experts the Court deems appropriate.

95.     Alternatively, Plaintiff should be awarded the quantifiable costs of such a monitoring program for Plaintiff to undertake.

96.     Defendants' conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including Plaintiff) that has a great probability of causing substantial harm.  Punitive damages are warranted

## COUNT SEVEN
### Trespass

97.     Plaintiff incorporates all preceding paragraphs as if fully set forth herein.

98.     The Defendants' conducted an intentional "controlled explosion" of the railroad cars and a burn of the hazardous, toxic, and dangerous chemicals and materials, causing these chemicals and materials and the byproducts resulting from the burn, to enter and contaminate and/or substantially damage the Plaintiffs property.

99.     The Defendants' conducted the explosion and burn knowing that it would result in such harm to the Plaintiffs' property.

100.   These chemicals, materials, and byproducts that were emitted by Defendant's explosion and burn have invaded and continue to invade the Plaintiffs' property, and have interfered with its possession, use, and enjoyment of its properties.

101. These actions constitute a trespass, including a continuing trespass, on their properties.

102. As a direct and proximate result of this trespass, Plaintiff has been harmed, including but not limited to medical and health issues for its students and staff; testing and monitoring the impact on their property and water sources; monetary expenses relating to evacuation and/or cleanup of their property and/or drinking water; monetary expenses related to remedial measures taken by public school districts and private schools to ensure safe and clean air and water at school facilities; damage to personal property and real property, loss of use and enjoyment of property, increased risk of disease, and expenses of future medical monitoring.

103. Defendant's conduct averred herein constitutes willful and wanton conduct, and actual malice, and shows a conscious disregard of the rights and safety of other persons (including Plaintiff) that has a great probability of causing substantial harm. Punitive damages are warranted.

WHEREFORE, Plaintiffs, individually, request that this Honorable Court:

A. Award compensatory and statutory damages for the injuries suffered by the Plaintiff;

B. Award punitive damages;

C. Award attorneys' fees, costs, and expenses, as allowed by law;

D. Interest on all amounts awarded;

E. Equitable, injunctive and declaratory relief, including future medical monitoring;

F. Any other relief that this Honorable Court deems just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiff respectfully demand a trial by jury on all jury triable issues.

Respectfully Submitted,

**SHENKAN INJURY LAWYERS, LLC**

By: */s/ Richard Shenkan*
Richard Shenkan
rshenkan@shenkenlaw.com
PA I.D. No. 79800
P.O. Box 7255
New Castle, PA 16107

**FRANTZ LAW GROUP, APLC**

By: */s/ James Frantz*
James Frantz (Pro Hac Vice Pending)
JPF@frantzlawgroup.com
William Shinoff (Pro Hac Vice Pending)
wshinoff@frantzlawgroup.com
Regina Bagdasarian (Pro Hac Vice Pending)
regina@frantzlawgroup.com
402 West Broadway, Suite 860
San Diego, CA 92101

*Counsel for Plaintiffs*

**DILLON, McCANDLESS, KING COULTER & GRAHAM, L.L.P.**

By: */s/ Thomas W. King, III*
Thomas W. King, III
PA I.D. No. 21580
tking@dmkcg.com
Jordan P. Shuber
PA I.D. No. 317823
jshuber@dmkcg.com
128 West Cunningham St.
Butler, PA 16001